in February of 2003. And what Mr. Winder was disclosing is that funds were diverted from the transportation budget and the practice had been that because there was a shortage of bus drivers, the bus drivers were discouraged from taking their vacation time because if the drivers were on vacation there were no substitutes, there was no backup. These funds were diverted. Mr. Winder told Mr. Erste before Christmas in 2002 that there were serious problems with refusing to pay the bus drivers their accumulated vacation in cash, which had been the practice, and that there was going to be a problem. He made the similar disclosure the second to the special master appointed by the number of disclosures indicating that there was going to be a problem, that there was going to be a walkout or some sort of strike or labor action. Mr. Winder ultimately made these disclosures to a committee of the District of Columbia Council explaining in considerable detail exactly what happened and why the disclosures were more than just inadequacies in the pay system. The disclosures, in this case, involved the failure of Mr. Erste to take any action even though the problem was on the horizon in Erste's decision to not pay the bus drivers their accumulated vacation. We submit under the law of the circuit, particularly under Coleman, that there's a jury question as to whether or not Mr. Winder made protected disclosures during the December, January, and February time period. So let me ask you, the D.C. Court of Appeals has taken a view in familiar with the case of Williams versus D.C.? Yes, I am. All right, so saying that where there's public knowledge and vocalized concern, that's not protected? That's correct, Your Honor. All right, so here, why isn't everything your client was talking about, why doesn't it come within that general concept? For example, there was general knowledge that the transportation system wasn't working well. There was general knowledge that the payroll system was ineffective. What new information did he impart? Number one, that funds were diverted from the transportation budget. So why is that an indication of gross mismanagement? Well, because the reason why it appears, the reason why the funds were diverted, is because of prior, for example, hiring people for no-show jobs, and that meant that the... I didn't see that in his disclosure. Well, this is part of the, I guess, part of the in the record, and you're more familiar with the record than I, is that he claimed that certain funds that could have been used for his program, transportation, were diverted elsewhere. That's correct, Your Honor. But they weren't diverted to programs that were subject to the terms of the consent order. Is that clear from what he said? I believe it was in terms of his discussion of the disclosures, but perhaps more of the, more to Your Honor's point, the issue was, Winder saw that this was creating a problem. He repeatedly warned Erste. But everybody knew there was a problem. They didn't know that the bus drivers were not going to get their vacation pay, and they had previously gotten the vacation pay. The numbers, approximately $1.2 million is what the vacation pay would have cost the Transportation Department. And so there was an implied commitment or understanding that the bus drivers would not take vacation so that they would be available to transport the children to school. And what happened is that Winder told Erste, and subsequently disclosed this to the council and to the special master, that Winder told Erste there's a problem. Winder told Erste that this was what was going to happen if he didn't pay the vacation pay. It seems like this is jumbling together a lot of stuff. It's a little bit hard to keep track of exactly which allegations of misuse go to which statements that were made by Winder through the process. Because the way I read it, there's some assertions to the effect that there was a diversion of $1.2 million. From a place that would have been for a particular purpose to a place that is at least open to other purposes. And then subsequently, there was a question about exactly why there was the so-called sick out. And as to that, there was testimony in the city council meeting that there's no record of, but there was testimony in the city council meeting. But the way you're talking about it today, it makes it seem like it's all compacted into one thing. That there was $1 million that was moved out, and that would have been the $1 million that was going to be used for vacation pay. And that $1 million wasn't there anymore, and that led directly to the sick out. But then the way the case has been presented so far, as far as I could tell, was not that that was all one seamless course of conduct that was being disclosed. It's that there was an issue about a diversion of funds, and that was the subject of something that Winder made some comments about. And then there's the question about what led to the sick out, and that was an issue as to which Winder made some comments in the city council meeting. It didn't seem like they were all together in one seamless course of conduct that was interrelated. Well, there are two ways to look at it, we'd submit. Number one is that they were all separate disclosures for the purposes of the DCWPA. But secondly, they're related because the funds were diverted. Winder told Darcy, there's a problem, you've got to do something about it. And he subsequently... Before you go any further with that, Winder told him there was a problem and you have to do something about it, but did he tell him that if he doesn't pay the vacation pay, it's going to cause a labor problem? Yes, he did. Where did he... I know you say that in your brief, but I can't find it in the record. Well, in the Winder's 2013 declaration, we provide a lot more detail. Well, in the 2013, is that what you're talking about, the 2013 affidavit? Yeah, he says only that Ernst diverted the money, or Ernst refused to pay the overtime, I mean the vacation pay. He doesn't say that he warned him that if he didn't pay it, there would be a labor problem. I don't see that in there. I think when the court considers the 2013 affidavit, that's one of the answers. I'm asking about the 2013 affidavit. I mean, I can understand your argument if there was evidence that he said to Ernst, hey, look, if you don't pay this, these guys are going to walk out, we're going to have a big problem, and Ernst ignored that. Then you might be getting close to something here, but according to the record, as opposed to your brief, all I can find, and if I'm missing it, tell me, all I can find is that he disclosed to the council that it was Ernst's decision not to pay the accrued vacation rate. That's all. Well, just in terms of Winder's response, he disclosed to the council that what was really going on is that the funds were diverted, and this was causing the labor problem, and that he tried to warn Ernst. You keep saying that. I'm asking you where in the record, in the declarations or interrogatories, there is that evidence. I know you say it in your brief, but I can't find it in the record. And the one cite you have to the record is you cite at page 29, this is of your brief, you cite an interrogatory, but that interrogatory doesn't have anything to do with the issue. By the way, which is typical of a lot of your record cites in the brief, it was very difficult to work with this. Many of your citations to the record are inaccurate. Not a good idea to annoy our law clerks. I apologize for that, Your Honor. Right. Well, our understanding of the record is that between the answers, the interrogatory, the supplemental answers that were- Okay. But you can't cite anything to me. Maybe on your rebuttal, you'll point that out to us. I'll do that, Your Honor. Okay. And let me ask you one related question about that. I'm not familiar with the petty litigation, or at least I haven't been for years. Are there any orders? As I understand it, that case, as you said, when you stood up, was designed, aimed to make sure the district got bus drivers out on time, right? That they were on the street when they needed to be, that the system ran. Were there any orders in petty requiring DCPS to pay, to add funds to the transportation budget, or to spend it in a particular way? The orders in petty established the 23 standards, including the maximum amount of time, for example, the students were supposed to be in the bus. I know. Was there anything about funding? Nothing. I don't remember the case as being about funding. The district had a lot of money. It was just a problem of gross incompetence, correct? I think it was more than that. I think it was an unwillingness to comply with the consent orders. That's fine, too. But my question is, are you aware of any orders where the district was ordered to increase the amount of funding for specialty transportation, or to spend it in any particular way? I'm not, and I'm just wondering whether you are, because it relates to your claim about the diversion of the $1.2 million. I mean, if petty is not about money, it's hard to see how a judgment to move a million dollars from one education account to another could be evidence of gross mismanagement. Well, the issue with respect to moving the money is that the Transportation Department was under a consent order, and in moving the money, what the effect of this was, was to lead to the labor stoppage in January of 2000. And again, where is the evidence that... Where is the evidence? I think Judge Srinivasan asked you the same question. Where is the evidence in the record that connects these two things? Part of the evidence is in Winder's description of what happened. Part of the evidence is in the temporal relationship, and the fact that he had talked with all the bus drivers, and they had a previous understanding that the bus drivers would be paid their accumulated vacation pay in cash, and this was the practice that DCPS had followed in terms of making sure that they could have enough bus drivers available to pick up the kids and to take them home. And so it was the act of policy to discourage any of the bus drivers from actually taking the vacation that they accrued. They'd gotten a waiver in prior years to allow the payment of cash of the accumulated vacation pay to the bus drivers, and that that's what they planned to do in 2002. Erste decided that he knew he was not going to do that. He was going to break with past practice and not pay the bus drivers in cash, which ultimately led to the walkout of the bus drivers who had been expecting to have the money essentially to pay for or to fund their purchase of Christmas gifts. And yeah, when I come back up here on, I can try and locate a more precise citation. Thank you. Good morning, and may it please the court. Carl Schifferle for the District of Columbia and Louis Erste. Let me jump right in where we were on the merits of the whistleblower claim. First of all, I would point out the requirement that in evaluating a protected disclosure, you look at the disclosure itself, what was actually said, rather than the subsequent characterization of that disclosure and litigation. I think that is particularly pertinent given the argument here today. There is, for example, no link between, no link actually in the record or below that between this issue of reallocation of funds and his testimony at the council hearing about the driver's sick out. So no reasonable inference? No, no, I don't think there's a reasonable inference. But then, as I said, it's not how we might characterize it in litigation. It's what the actual content of the disclosures were at the time and what the evidence shows those to be. There is no evidence supporting such a link. So even if there is a temporal link, that would not be enough? Right, right, because there's, I mean, the testimony about the reallocation of funds is itself very vague. It doesn't indicate any impact whatsoever from that reallocation of funds. And as we pointed out, there was no impact, because the Transportation Division could spend money as needed. And in fact, that's what it did in fiscal year 2002. It went well over what was budgeted, but there was no obstacle to doing so. And that was the evidence that the Transportation Division could spend money as needed. There was no misuse of these funds. They were spent on other educational priorities within DC public schools. So this is not a situation where there's a gross misuse or waste of funds simply because funds are used on one educational priority rather than another. If Mr. Winder has a disagreement about that, that's just a mere difference of opinion. It's not a disclosure of gross mismanagement or a misuse or waste of funds. It would have to be a serious and unquestionable error that was being committed. And that's not what the evidence shows in this particular case with regard to the allocation or reallocation of funds. What about the City Council meeting? So with respect to the City Council meeting, yes, the evidence shows that what he disclosed was already well known publicly. These issues with driver absenteeism and payroll problems for the drivers and leave balances and so forth. This was already well known publicly reported in the press. It would be surprising to me if that were really the law, that as long as there's some general set of issues that's generally publicly known, that somebody brings to light a specific instance that, you know, in some sense might be a manifestation of that. But as a particular instance that, and let's just suppose for these purposes that it raises some serious questions about that particular instance, that the law would be that, well, that doesn't matter because generally people kind of understood that there was a problem in this area. So we're not going to protect someone who comes forward and says, I saw a particular instance of this that really raised some issues you all ought to be aware of. Is that really the law? That seems to be surprising to me. Well, no, I recognize your point if it's at a very general level and then someone comes forward with something specific that might highlight something that is truly independent and unknown. No, not independent. Not independent because it's the same course of conduct. It's that, yeah, there's all kinds of management issues in this program and there's, you can get it at any specific level of detail, but then we have a new instance. Yeah, maybe I should have said new and different rather than independent, even if it falls under the same general rubric. I mean, we do cite the Bowman case from this court, the Williams versus District of Columbia case from the DC Court of Appeals and those support the general principle that I was arguing that where it is already publicly known, that is not a disclosure. But to address the arguably new information that Mr. Wynder disclosed at the council hearing about the purported reason for the sick out, I guess, first of all, there's no evidence that of these additional characterizations that were presented here today that Mr. Wynder warned Erskine that this was going to be a problem and that a sick out would resolve. There's no evidence of that in the record. I would also note that it is not a disclosure of gross mismanagement or any other protected category under the act. First of all, he presents no objectively reasonable basis for his belief that the failure to pay the accrued leave was the cause for the driver's sick out. There's no evidence in the record what basis he had for this belief. The Washington Times article that reported on it gave the recurring issues in the past, that there were payroll problems, that inaccurate leave balances, no mention of this being a reason. And in fact, the drivers themselves denied that it was the sick out that the claim was that they were actually sick. So there's no evidence in the record indicating why Mr. Wynder would have had an objective. It wouldn't be terribly surprising that they said that they were sick given the circumstances. Right, right. I recognize that. But my point only is, I'm trying to show that there's no objectively reasonable basis in the record. Is there no evidence? I don't know the answer to this. Is there no evidence from, is there no testimony by Wynder himself that the way he gained this knowledge is by talking to the people? There's no evidence. There's no evidence whatsoever. And even then, even assuming it were otherwise, there is no evidence that this would have constituted gross mismanagement. The drivers did not have an entitlement to payments of accrued leave at the end of the year. In fact, the transportation division manual, which is in the record, as well as the personnel regulations, specify that. So let's suppose, just for arguments purposes, that there's some, there's at least an issue on whether this was in fact improper to cut off this funding to which the drivers apparently had grown accustomed. Let's just stipulate that maybe that there was every entitlement, that there was every right to do that, to cut that off, and so the drivers didn't in fact have an entitlement to this. But if the head of the program comes to the supervisor and says, look, I don't know if this is right or wrong, what you're planning to do, but this, I'm just going to tell you, this is going to cause upheaval. We're under a decree to make sure that we don't have a problem with transportation in this area. I'm just going to tell you that if we do this, this is going to be a big, big problem. And then the supervisor just says, ah, you know, no entitlement, too bad. I'm walking away. It seems to me like that could be gross mismanagement just based on the lack of any reaction, independently of whether it was in fact ultimately proper to do. I, no, I, you know, assuming all those assumptions, I would still disagree that that would be gross mismanagement because what you have is a reasonable disagreement. Reasonable people could disagree on whether employees who are not entitled to this pay should nevertheless be paid it just because it happened a year before or two years before. You also have, I mean- I'm not talking about whether they should be paid it. I'm talking about the reaction that they're going to, even if the reaction is wrong, if they're just wrong to think we should be paid this, if the alert that's raised is, yeah, look, it may be true that they have no entitlement to this. I'm just telling you they think they do. And unless we do something about it, they're not going to provide transportation on these days. It's going to cause a problem for these kids. And the supervisor just says, ah, yeah, well, they're not entitled to it. I don't care. Well, that might be a disclosure of something that might be important for a supervisor to know, but that's not the test under the whistleblower protection act. It has to fall under a particular category. Having read your brief, I don't understand your response to Judge Srinivasan. I would have thought you would say, yes, you're absolutely right. That would be a protected disclosure that would show gross mismanagement. But are you, in refusing to say that, are you agreeing with his characterization of the record, namely that Winder said to Erst, you know, look, I don't know whether they're entitled to this or not, but I guarantee you, if you don't pay it, we're going to have a big labor strike. We're going to have a mess. And he ignored that? Is that? But my position is that that is not the evidence in the record. Well, why didn't you answer the question that way? Is that your answer? I mean, that's the question I asked your counsel for a plaintiff, and he said he would look up whether there was such evidence in the record. Right, no, no. Do you know whether there is any? There is no evidence. I've looked at the record carefully. Perhaps I missed something because of the poor citation of the record. But no, there is no evidence in the record. So that was my, I was assuming a hypothetical in answering Judge Srinivasan's question. I didn't mean to concede anything about the state of the evidence in the record because yeah, that evidence does not exist. The question, the answer to this question has to be right. I mean, that would clearly be evidence of gross mismanagement under the facts he gave you. But it's hard for me to see how you could resist that. Well, because it has to fall within one of the protected categories of the act. Gross mismanagement has to be something that, you know, that there could be no serious dispute. Reasonable people could not disagree about a management action. And the question is, well, what do you do in this situation? I think reasonable people could disagree about how to handle that. Let me ask you a different question. In your brief, you argue we don't have to get to any of this at all, right? Because the district court should not have reinstated the whistleblower claims. Correct, Your Honor. I'm happy to address that. Well, yeah, that's why I asked the question. Okay. What, in response, you say in your brief, look, we have a judgment and it's been affirmed on appeal, right? The district court has an interest in that. The reply brief says, well, wait a minute. It's not a final order. This case is still ongoing. And therefore, this new law can be applied to reopen the case. What do you think about that? No, because there was a final order that dismissed the whistleblower claims. It was appealed to this court. This court affirmed the dismissal of the whistleblower claims. So there is a final judgment as to the whistleblower claims. Have you found a case on that point? I haven't. I'm just curious. Do you know of a case where, I mean, obviously, if the district court had granted a final judgment in the entire case and it went up and got affirmed, I don't think anybody would argue that the new law could be applied retroactively. Right. So the question is, is there something about the fact that it wasn't, it isn't, this is only part of the case. Right, I don't think. Do you know of a case that covers that issue? Because I don't. No, I don't have a particular case to cite. But I don't think that mere happenstance should make a dispositive difference. If we agree that if the case were closed, it would not retroactively apply. I don't see why the mere happenstance that there are other unrelated claims that still be going on. I don't think the mere happenstance goes in many directions because it's a mere happenstance that the timing worked out so that the affirmance would have happened before the law changed. I mean, there's all kinds of happenstances that you could imagine. So I don't understand why that's a. But that latter happenstance created a judgment that created a settled expectations. So it's not. What expectations? The happenstance of the timing. No, but what are the expectations? I'm not clear what the expectations are because if the case is still going to go forward on other claims that arise out of the same facts. So it turns out that there's a related claim that arises out of the same facts that now springs to life because the law has changed. Right. But you have that judgment, that order of dismissal that's been affirmed by this court of the whistleblower claims in their entirety. I think that's just a question of characterization. And I think this goes to the heart of Judge Tatel's question, which is that it's true that if there were in fact a final judgment that everybody agrees that at the time that everything congeals into a final judgment, finality considerations come into play so that we don't ordinarily assume a new law affects something that's already been final. But generally the way we think about cases is as long as there's a claim that's alive, the case keeps going. And for example, suppose it had never gone up to an appeal and the district judge resolves this claim and it's done with it. I'm done with this claim. I'm only going forward on remaining claims. You could say, well, that part of the case is over. Everything else continues. And then the law changes and it allows the dismissed claim to come back to life. I think I don't think anybody would be claiming that the new change doesn't apply to the claim that's already been dismissed in quotes by the district judge. Perhaps. But in that situation, there has not been a judgment in the sense that there was a final order that was appealable, which is what exists in this case. I mean, I would also point out to the Mayo decision from the D.C. Court of Appeals, which I think is analogous there. The case was still open in some respect. In fact, more so than here because it was on direct review and the D.C. Court of Appeals says we're not going to go back and apply this law retroactively to a claim that's already been processed and decided. I think the Mayo case is persuasive authority. Well, I shouldn't say persuasive authority. It is a question of statutory interpretation of district law and that should be applied here. Unless there are further questions. Thank you. Judge Tatum, I just briefly looked through the 2013 declaration and I'd like to draw the following paragraphs to your attention and the attention of the court. I have the citation to the district court docket number. I do not have handy citation to the appendix that I can. Well, are these are these sites you're about to give us in the joint appendix? I beg your pardon? Are these sites you're going to give us in the joint appendix? Yes, they are. But you don't have those sites? I don't have the page site to the joint appendix. I have the site to the district courts pleading document number 210-1. What paragraphs do you want us to focus on? 18, 20, 22, 24, 52 where Winder talks specifically about the disclosures that he made to the D.C. Council. And so are you suggesting that if we read those paragraphs in light of your discussion this morning that we will see the link? Yes, Your Honor. Well, more specifically, could you just read me your best example of where he says to erst if you don't, these guys aren't going to show up. If you don't pay these guys their accrued vacation, they aren't going to show up. We're going to have a disaster. And he ignored that. Just give me your best. Don't read them all to me. Just the best one. In paragraph 18, Winder says in my testimony, I explained that the strike occurred because the bus drivers did not receive checks for accrued vacation they expected to receive. Okay, we know that. But where did he say, I told erst that if he didn't pay the accrued? Well, this was in the context of what he told the council. So it's not specific to what he precisely told us. That's your best one that you just cited. Well, in paragraph 20, 22, Erste Winder says, part of the reason the bus drivers didn't receive vacation checks is that early in the year, Erste abruptly and secretly decided he would not pay the accrued leave and the Christmas paychecks. So bus drivers would not be able to elect to be paid cash in lieu of taking off. And just on the question of the applicability of the amendment of the 2009 amendment to this case, I think it's probably indistinguishable from this court's decision of Williams, but perhaps more to the point, there was no cross appeal by the district. And secondly, the district in its opposition to what was captioned as plaintiff's motion  of the whistleblower claims waived the argument. They never challenged the decision of the district court. They never challenged the jurisdiction of the district court to address squarely the issue of the applicability of the 2000 2009 amendment of the WPA to this case. Well, they didn't raise certain issues, but they did raise retroactivity. They did not. The district did not raise certain issues, but it did raise the question of retroactivity. Yes, they did challenge. They challenged the merits of the of the issue. And I would respectfully submit that that was an issue that was decided by this court in Williams earlier this year. All right. Anything further? No, you're right. Thank you. We'll take the case under advisement.
judges: Rogers, Tatel, Srinivasan